Wm. P. Neil Company, Ltd. v. Commissioner.
Wm. P. Neil Co. v. Commissioner
Docket No. 3953.
United States Tax Court
1946 Tax Ct. Memo LEXIS 206; 5 T.C.M. (CCH) 323; T.C.M. (RIA) 46096; April 29, 1946
John O. Palstine, Esq., Joseph D. Brady, Esq., and Preston D. Orem, Esq., 416 W. 8th St., Los Angeles 14, Calif., for the petitioner. E. A. Tonjes, Esq., for the respondent. HARLAN Memorandum Findings of Fact and Opinion HARLAN, Judge: The respondent determined deficiencies in income and excessprofits taxes of petitioner as follows: Year
Kind of Tax
Deficiency
1940
Income
$ 8,239.79
Excess-Profits
5,832.64
1941
Income
9,320.85
Excess-Profits
14,704.12
The sole issue is - What is reasonable compensation for the personal services rendered to the petitioner during the years 1940 and 1941 by its President, Wm. P. Neil? Findings of Fact The petitioner is a California corporation with its principal *207 place of business at Los Angeles, California. Since its organization in 1924, it has been continuously engaged in the general contracting business. During the taxable years, 1940 and 1941, its business consisted of designing and constructing industrial buildings and facilities and constructing certain ammunition depot facilities, hospital facilities, and low cost housing for the United States Navy Department. The petitioner filed its income tax returns for the taxable years 1940 and 1941 with the collector of internal revenue for the sixth district of California. Petitioner's income in 1940 and 1941 was derived in part from building, installation or construction contracts covering a period in excess of one year from the date of execution of the contract to the date on which the contract was finally completed and accepted. Petitioner elected as a consistent practice to report gross income for the taxable year in which the contract was finally completed and accepted and so reported its income for the taxable years 1940 and 1941. The petitioner was organized by Wm. P. Neil in 1924 with a paid-in-capital of $10,000. Neil has been petitioner's president since its organization and its *208 sole stockholder since 1930. Neil was born in Scotland where as a young man he learned the masonry trades. He went to Canda and was employed by a firm of general contractors. In 1908 he came to the United States and has remained here ever since. He was 59 years old in 1940. Neil attended various technical schools in Chicago taking courses in civil and structural engineering and reinforced concrete. He became superintendent for a large general contracting firm in Chicago and did considerable work in connection with the development of the central manufacturing district of Chicago. In 1921 Neil went into business for himself as a general contractor and engineer. Neil came to Los Angeles in 1922 when he entered the employ of the Central Manufacturing District of Los Angeles. In 1924 Neil organized the petitioner corporation with which he has been associated continuously since the date of its organization and through the taxable years 1940 and 1941. The petitioner corporation constructed many buildings between 1924 and 1940 in the central manufacturing district of Los Angeles, some of the buildings costing as much as $3,000,000. Petitioner's gross sales on completed contracts, the *209 value of completed work on incomplete contracts, and the total of work performed by petitioner during the year, for each of the years 1936 through 1941, were as follows: Gross Sales -
Gross Sales
Value of Completed Work
Based on
Completed
on Incomplete Contracts
Work Performed
Year
Contracts
January 1
December 31
During Year
1936
$ 456,030.94
$ none
$ 357,790.17
$ 813,821.11
1937
1,031,133.92
357,790.17
2,800.00
676,143.75
1938
636,740.41
2,800.00
81,202.50
715,142.91
1939
1,641,796.51
81,202.50
35,471.13
1,596,065.14
1940
1,660,214.92
35,471.13
344,983.24
1,969,727.03
1941
2,935,560.63
344,983.24
1,552,090.28
4,142,667.67
During the years 1936 through 1939, Neil devoted only three-quarters of his time to the business of petitioner. The balance of his time was spent during these years in the performance of duties for the Azusa Rock and Sand Company. Neil was the owner of all of the capital stock of this company and received compensation from it in the sum of $13,000 in 1936, $6,131.50 in 1937, and $5,867.78 in 1938. He received no compensation from this company in 1939 because it was not earning any *210 profits. The petitioner paid Neil $12,000 in 1936, $18,000 in 1937, $12,000 in 1938 and $12,000 in 1939. Petitioner's net income or loss for each of the years 1936 to 1939, inclusive, after deducting the salary paid to Neil, was as follows: 1936
$ (1,711.90)
(loss)
1937
25,968.84
1938
15,202.07
1939
40,271.14
In 1939 the petitioner undertook the performance of certain contracts with the United States Navy Department for the construction of a large ammunition depot at Hawthorne, Nevada. The first contract on this job, entered into on February 11, 1939, was for approximately $460,000 of work and was completed during the same year. On December 26, 1939, petitioner entered into an additional contract with the Navy Department for additional facilities at Hawthorne amounting to approximately $1,140,000 and on October 3, 1940, another contract for additional facilities in the sum of $2,140,000 was entered into and in 1941 further supplemental contracts were entered into in the amount of $4,560,000, thus making a grand total of $8,300,000. During the years 1940 and 1941 Neil devoted 100 percent of his time to performing services for petitioner, and was required *211 to increase his working day to 14 or 16 hours per day. Petitioner's contracts with the Navy entered into in 1939, 1940 and 1941 called for the erection of 361 buildings. These buildings were of many different types, and included ammunition magazines, storage buildings, housing units and a boiler house and electric substation. They varied in size from 1,000 square feet to 10,000 square feet and were scattered over an area 11 or 12 miles by 8 miles. In connection with the performance of the Hawthorne contract with the Navy Department, the petitioner entered into 41 subcontracts calling for the performance of various jobs incident to the performance of the major contracts, such as, structural steel work, electric wiring, sheet metal work, painting, construction of railroad tracks, roofing, and other incidentals totaling $3,722,121.14. Petitioner's business, and its reputation and success, depended entirely upon the knowledge, experience, ability, energy, and reputation of Neil. In performing his services to petitioner, Neil was required to do the estimating and to prepare the bids upon which petitioner obtained the contracts for its services, to arrange for the financing (including *212 the guarantee of loans), to arrange for surety bonds when requiring (including the furnishing of the necessary indemnity to the surety company), to arrange for getting equipment on the job and getting a crew hired to work on the job, to arrange for sub-contractors, and to get all of the material on the job, and to supervise the performance of the work. There was no person in petitioner's organization other than Neil capable of performing these important functions. In addition to its President, Neil, petitioner had a treasurer and secretary, but did not have any vice president. The functions performed by the individuals holding the offices of treasurer and secretary were mostly clerical, or were performed under the supervision of Neil. He decided what had to be done by them and they would do it. All of the contracts awarded to petitioner were obtained as a result of competitive bids. Neil personally prepared all bids made by petitioner and did whatever estimating was necessary. He also arranged for surety bonds when required and otherwise arranged the petitioner's financial matters. He made arrangements with subcontractors and material men. His reputation in the contracting field *213 was good, and so also was his credit rating. The contracts with the Navy Department required surety bonds and the Surety Company required Neil to become liable as an indemnitor. He was never required to make any payments on account of his liability as indemnitor or endorsee of the petitioner's liabilities. Petitioner performed its first work in connection with the construction of an ammunition depot for the Navy at Hawthorne, Nevada, in 1939. The 1939 contract was for about $464,000 of construction work, and was completed during that year. In 1940, the work performed at Hawthorne amounted to about $1,426,000 and in 1941 to approximately $3,488,000. The location of the work at Hawthorne, and its remoteness from the place of business of the subcontractors and material men, made the problem of coordinating their activities and of obtaining performance of their contracts considerably more complex than would have been the case if the work had been at a site nearer to the centers of population. As the result of the successful performance by petitioner of its 1940 and 1941 contractual obligations, it obtained, in 1942 additional contracts with the Navy for more than $16,000,000 of construction *214 work, on a cost-plus-a-fixed-fee basis. On January 2, 1940, and January 7, 1941, the corporation adopted resolutions to the effect that the salary of Neil for the respective years be fixed at $1,000 per month subject to the adjustment by the allowance of additional compensation to Neil at such time and to the extent that the business and profits of the company warranted. On December 3, 1940, and December 2, 1941, the following resolutions were adopted by the petitioner: Resolution of December 3, 1940: Financial statements for the month of October, 1940, were presented by the Secretary and discussed by the Board. The Directors then discussed the adjustment of the salary of Wm. P. Neil, as President of the Company, in accordance with the provisions of the resolutions adopted on January 2nd, 1940. In view of the large operations of the Company during the year, the handsome profits realized and the heavy duties which fell to Mr. Neil during the year, the Directors felt that a substantial adjustment of the salary of Mr. Neil was in order. THEREUPON, UPON MOTION DULY MADE, seconded and unanimously carried, it was: RESOLVED, that the salary of Wm. P. Neil as President of this *215 Company shall be $50,000.00 for the year ended December 31, 1940. Further Resolved, that whereas the sum of $12,000.00 has been previously credited to the personal account of Mr. Wm. P. Neil upon the books of the Company, the additional sum of $38,000.00 shall be credited to his account and a note shall then be issued to him for the net credit balance remaining in his account. Said note shall be payable upon demand, shall be dated December 15, 1940, and shall bear interest at the rate of 4% per annum. Resolution of December 2, 1941: The Directors then discussed the salary of Mr. Wm. P. Neil as President of the Company in accordance with the terms of the resolution passed by the Board at its regular meeting in January, 1941. It was decided that the salary of Mr. Neil should be the same for 1941 as for 1940. THEREUPON, UPON MOTION DULY MADE, seconded and unanimously carried, it was: RESOLVED, that the salary of Wm. P. Neil as President of this Company shall be $50,000.00 for the year 1941. The amount of additional compensation awarded to Neil was fixed at the end of each of the taxable years and the sum was suggested by the accountant-attorney who prepared the petitioner's *216 income tax return. In its income tax returns for 1940 and 1941, petitioner claimed deductions for compensation for services rendered by its president, Wm. P. Neil, in the amount of $50,000 per annum. The petitioner paid no dividends during the years 1940 and 1941. The only cash dividends paid by the petitioner was $15,000 in 1937 and $10,000 in 1938. A summary of petitioner's balance sheets, as of the end of the calendar years indicated (after adjustments as contained in final notice of deficiency dated December 7, 1943, for 1940 and 1941, except the adjustments of compensation paid to Wm. P. Neil), is shown in the following table: PARTICULARS
1936
1937
1938
Current Assets
$303,501.80
$ 91,155.64
$ 128,886.31
Fixed Assets
9,040.50
12,590.99
15,597.65
Other Assets
7,578.78
11,622.54
11,052.42
TOTAL ASSETS
$320,121.08
$ 115,369.17
$ 155,536.38
Current Liabilities
$251,553.15
$ 36,636.28
$ 53,992.82
Other Liabilities
TOTAL LIABILITIES
$251,553.15
$ 36,636.28
$ 53,992.82
Capital Stock
10,000.00
10,000.00
* 75,000.00
Surplus
58,567.93
68,732.89
26,543.56
TOTAL LIABILITIES, CAPITAL STOCK
AND SURPLUS
$320,121.08
$ 115,369.17
$ 155,536.38
PARTICULARS
1939
1940
1941
Current Assets
$179,320.55
$1,434,206.04
$1,522,272.55
Fixed Assets
37,624.12
90,930.99
125,440.19
Other Assets
11,590.09
16,512.83
92,499.03
TOTAL ASSETS
$228,534.76
$1,541,649.86
$1,740,211.77
Current Liabilities
$ 98,131.96
$1,375,778.71
$1,507,457.58
Other Liabilities
39,928.81
TOTAL LIABILITIES
$ 98,131.96
$1,375,778.71
$1,547,386.39
Capital Stock
75,000.00
75,000.00
75,000.00
Surplus
55,402.80
90,871.15
117,825.38
TOTAL LIABILITIES, CAPITAL STOCK
AND SURPLUS
$228,534.76
$1,541,649.86
$1,740,211.77
*217 534.76 $1,541,649.86 $1,740,211.77 The total payroll of the petitioner and the average number of employees for the years 1938 to 1941 are as follows: Average
Year Ended
Total
Number of
December 31
Payrolls
Employees
1938
$270,397.94
181
1939
429,433.68
286
1940
468,299.65
350
1941
886,076.34
518
Reasonable compensation for the personal services rendered to the petitioner by William P. Neil during the years 1940 and 1941 is $25,000 per year. Opinion In computing net income, section 23 (a) (1) I.R.C. permits the deduction of all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered. As shown by our findings, petitioner in its returns for the taxable years 1940 and 1941, claimed deductions of $50,000 per annum for compensation for services rendered by William P. Neil, its president and sole stockholder. Respondent determined that *218 $25,000 per annum represented reasonable compensation for services rendered by Neil, and disallowed the balance of $25,000 in each of the years. There is no fixed yardstick for determining the reasonableness of compensation paid by a corporation to one of its officers. Each case must stand upon its own peculiar facts, and in determining whether compensation is reasonable, the situation must be considered as a whole. Voluminous evidence was introduced by petitioner in support of its contention that $50,000 constituted reasonable compensation for Neil. From this evidence it appears that responsibility for the performance by petitioner of work under the contracts mentioned in our findings rested primarily upon Neil; that he handled the making of the estimates and bids; arranged for any financing required, for getting the equipment and crew on the job, and for sub-contractors and supplies of material; and also supervised the conduct of the work. There is little doubt but that the time and effort expended by Neil in the service of petitioner increased considerably during the taxable years over what had been expended by him in its service during prior years. Moreover, we are satisfied *219 that he was considered to be and was a man of ability and well qualified by training and experience to serve as a general contractor. During the taxable years Neil rendered services in connection with contracts completed in those years and also in connection with contracts which were not completed until a subsequent year or years. Petitioner filed its returns on a completed contract basis. Its net income for the years 1937 to 1941, inclusive (before deducting compensation to Neil), and the compensation deducted in its returns for those years, was as follows: Year
Net Income
Compensation
1937
$43,968.84
$18,000
1938
27,202.07
12,000
1939
52,271.14
12,000
1940
98,129.30
50,000
1941
78,454.55
50,000 During the month of December, when the profits for each year could be estimated with reasonable accuracy, the amount to be paid Neil was fixed. The decision of the corporation's directors to pay him four times as much in 1940 and 1941 as he was paid in 1939 was based, according to the corporate resolution of December 3, 1940, upon "the large operations of the Company during the year, the handsome profits realized and the heavy duties which fell to Mr. *220 Neil * * *". No dividend distributions were made by petitioner in 1940 or 1941, and the only cash dividends paid by it during its entire existence were $15,000 in 1937 and $10,000 in 1938. During the years 1936 to 1941, inclusive, petitioner has paid Neil as salary, which has been allowed as reasonable compensation and deductible by the respondent, the sum of $104,000. A further recital of the evidence would serve no useful purpose. Suffice to say, that it has all received our careful consideration, and that our best judgment is, and we have found as a fact, that $25,000 per annum represented reasonable compensation for the services rendered by Neil to petitioner. Judgment will be entered for the respondent. Footnotes
*. It was in this year (1938) that $40,000 of petitioner's earned surplus was capitalized by a stock dividend of 400%.↩